UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

ANGELO CARZOGLIO,

                          Plaintiff,                    **DECISION AND ORDER**

        -against-                       18 Civ. 7780 (AEK)

ASSISTANT WARDEN KARL VOLLMER,
JAIL GUARD CURRY, JAIL GUARD
RODRIGUES, JAIL GUARD HOLORAN,
JAIL GUARD OLIVO, JAIL GUARD
ARCHER #1411, JAIL GUARD SUPERVISOR
McWILLIAMS, JAIL GUARD SUPERVISOR
B. ALLEN, JAIL GUARD SUPERVISOR
TORRES, and COUNTY OF WESTCHESTER,

                        Defendants.

-------------------------------------------------------------x

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.[1]**

      Angelo Carzoglio ("Plaintiff"), presently incarcerated at Wende Correctional Facility and

proceeding *pro se* and *in forma pauperis*, brings this action pursuant to 42 U.S.C. § 1983 against

Assistant Warden Karl Vollmer ("Asst. Warden Vollmer"); Correction Officers Omar Curry,

Michael Rodrigues, Daniel Halloran, Carlos Olivo, and Wanda Archer; Sergeants Derrick

McWilliams, Bruce Allen, and Ruben Torres; and the County of Westchester (collectively,

"Defendants").[2]  ECF No. 2.  Plaintiff alleges that he was subjected to (i) improper strip searches

---

[1] On June 7, 2022, the Honorable Nelson S. Román endorsed and docketed a fully
executed Form AO 85, "Notice, Consent, and Reference of a Civil Action to a Magistrate
Judge," in which the parties consented to the reassignment of this matter to a United States
Magistrate Judge in accordance with 28 U.S.C. § 636(c).  ECF No. 52.  This matter was then
reassigned to the undersigned.

[2] The Correction Officer defendants are referred to throughout this Decision and Order
using the abbreviation C.O. followed by their respective surname.  The Sergeant defendants are
referred to using the abbreviation Sgt. followed by their respective surname.

in violation of the Fourth Amendment; (ii) sexual abuse in violation of the Eighth Amendment;

(iii) an improper cell search in violation of the Eighth Amendment; (iv) retaliation for exercising

his First Amendment rights; (v) interference with his access to the courts; (vi) violations of the

Equal Protection Clause of the Fourteenth Amendment; (vii) a violation of the Procedural Due

Process Clause of the Fourteenth Amendment; and (viii) unconstitutional conditions of

confinement in violation of the Eighth and Fourteenth Amendments.

Currently before the Court is Defendants' motion for summary judgment.  ECF No 85.

For the reasons that follow, Defendants' motion is GRANTED.

## BACKGROUND

### I.    Factual Background

The facts set forth in this section are undisputed unless otherwise noted and are taken

from Defendants' Local Civil Rule 56.1 Statement, ECF No. 87 ("Defs.' 56.1 Statement"), and

supporting materials submitted by Defendants.  Plaintiff did not submit a response to

Defendants' Rule 56.1 Statement.[3]

---

[3] Local Civil Rule 56.1 of the Joint Local Rules of the United States District Courts for the Southern and Eastern Districts of New York mandates that "[t]he papers opposing a motion for summary judgment must include a correspondingly numbered paragraph admitting or denying, and otherwise responding to, each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  This requirement extends to a *pro se* plaintiff who has been provided with proper notice of this obligation pursuant to Local Civil Rule 56.2, as Plaintiff was here. *See* ECF No. 89; *Cain v. Esthetique*, 182 F. Supp. 3d 54, 63 (S.D.N.Y. 2016).  Although Plaintiff failed to file a counterstatement of material facts and therefore did not comply with the Local Rules, the Court has exercised its "broad discretion to determine whether to overlook a party's failure to comply with local court rules," and has opted to "conduct an assiduous review of the record" for purposes of deciding the instant motion.  *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (quotation marks omitted).

At all times relevant to this matter, Plaintiff was housed at the Westchester County Jail ("WCJ")—initially as a pre-trial detainee beginning on October 22, 2014, and later as a convicted prisoner after he pled guilty to certain charges on January 30, 2017.  *See* Defs.' 56.1 Statement ¶ 6; ECF No. 86 (Declaration of Sean T. Carey ("Carey Decl.")) Ex. B ("Housing History"); Carey Decl. Ex. F.  The WCJ complex is split into multiple sections, including the "Old Jail" and the "New Jail."  *See* Defs.' 56.1 Statement ¶¶ 12-13; Carey Decl. Ex L ("Pl.'s Dep. #2") at 88:16-89:23; Carey Decl. Ex AE ("Inmate Handbook") at 14.  The Old Jail section is, and at all relevant times was, approved by the New York State Commission of Correction ("NYSCOC") and compliant with New York State's minimum standards.  Defs.' 56.1 Statement ¶ 15; Carey Decl. Ex. E.

An inmate's housing assignment is determined by his or her "inmate classification" pursuant to the inmate classification policy and procedure of the Westchester County Department of Corrections ("WCDOC").  *See* Carey Decl. Ex. C ("Inmate Classification") at 2, 4-5, 7-10.  Upon his arrival at the WCJ, Plaintiff was housed in the New Jail.  *See* Defs.' 56.1 Statement ¶ 6.  On February 10, 2015, Plaintiff was found with a piece of wood hidden in his rectum.  *See id.* ¶ 7; Carey Decl. Ex. U ("Disciplinary File") at 1-8.[4]  At a disciplinary hearing held on February 23, 2015, Plaintiff pled guilty to possession of contraband and, in addition, was found guilty of disorderly conduct and commission of an act with the intent to cause inconvenience, annoyance, or alarm.  Defs.' 56.1 Statement ¶ 9; Disciplinary File at 8, 9, 12.  As a result, Plaintiff was sentenced to keeplock status (a type of disciplinary sanction, *see* Defs.' 56.1 Statement ¶ 8) for 30 days, and was reclassified as an "AA" level inmate.  *Id.* ¶¶ 9-10; Disciplinary File at 9.  This

---

[4] Plaintiff testified at deposition that the piece of wood was found "in the underwear pocket area," rather than in his rectum.  Carey Decl. Ex. K ("Pl.'s Dep. #1") at 67:16-23.  The particulars of where the piece of wood was found are not material to the outcome of this motion.

series of events resulted in a housing assignment in the Old Jail, where Plaintiff spent "a considerable portion of his time" during the remainder of his incarceration at the WCJ. *See* Defs.' 56.1 Statement ¶¶ 8, 11; *see generally* Housing History. As of May 19, 2017, however, Plaintiff was housed on the second floor of the northeast wing in the New Jail. Defs.' 56.1 Statement ¶ 75; Housing History at 1.

### A.    The Allegedly Improper Searches[5]

The majority of Plaintiff's claims stem from allegedly improper searches conducted by Defendants in May, June, August, and October 2017. Defs.' 56.1 Statement ¶¶ 29-136.

### 1.    The May 19, 2017 Searches

Plaintiff was searched five separate times on May 19, 2017. *Id.* ¶ 39. Each of the five searches is described below.

### a.    First Search

On May 19, 2017, Plaintiff was working in the law library located within the WCJ's New Jail section. *Id.* ¶ 40. At the direction of WCDOC Captain Abrams ("Capt. Abrams"), C.O. Rodrigues and C.O. Curry entered the law library to search the library itself and all of the inmates present. *Id.* ¶¶ 41-43; Carey Decl. Ex. AD ("Abrams Aff.") ¶ 11. The officers ordered Plaintiff and several other inmates to get against the wall and then conducted pat downs on each of them. Defs.' 56.1 Statement ¶ 44; Pl.'s Dep. #1 at 16:7-24; Carey Decl. Ex. V ("Law Library

---

[5] The May 19, 2017 and June 8, 2017 searches were also the subject of a separate lawsuit that Plaintiff filed against Asst. Warden Vollmer and other WCDOC employees not named in this lawsuit. Judge Román dismissed the claims against Asst. Warden Vollmer, two other individual defendants, and certain other parties on February 25, 2020, *see Carzoglio v. Abrams et al.*, No. 18-cv-4198, 2020 WL 905630 (S.D.N.Y. Feb. 25, 2020) ("*Carzoglio I*"); the case was reassigned on April 3, 2020, and Judge Philip M. Halpern granted the remaining defendants' motion for summary judgment on June 17, 2022, 2022 WL 2193376 (S.D.N.Y. June 17, 2022) ("*Carzoglio II*").

Video #1")[6] [7] at 19:55:50.32 - 20:02:04.80.  After the searches, the officers left the library.  Pl.'s

Dep. #1 at 16:16-18; Law Library Video #1 at 20:01:15.00.

### b.    Second Search

Sgt. Alfredo Lombardo was monitoring the WCJ's closed-circuit video system during

and after the first search, and believed that Plaintiff's behavior after the search was suspicious.

Defs.' 56.1 Statement ¶ 47; Abrams Aff. ¶ 21.  Specifically, Sgt. Lombardo saw Plaintiff remove

an unidentified object from an accordion file folder and move to a corner of the library that was

out of view of the closed-circuit video system.  Defs.' 56.1 Statement ¶ 48; Law Library Video

#1 at 20:02:24.93 - 20:03:57.96.  Plaintiff testified that he was accessing a filing cabinet where

he keeps some of his legal papers, and noted that he is one of only two inmates who typically

used that cabinet.  Pl.'s Dep #1 at 24:13-26:24.  After approximately four seconds, Plaintiff left

the corner and another inmate immediately went to that location.  Defs.' 56.1 Statement ¶¶ 48,

49; Law Library Video #1 at 20:03:59.22 - 20:04:21.23.

---

[6] Defendants submitted WCJ security camera footage from May 19, 2017 and June 8, 2017 in support of their motion.  *See* Carey Decl. Exs. V and W.  These videos were provided to Plaintiff during discovery, *see* ECF No. 71, and Plaintiff confirmed receipt on March 6, 2024, *see* ECF No. 72.  Defendants originally provided copies of these videos to the Court as part of a courtesy copy of their motion papers on October 5, 2023, *see* ECF No. 98-1, but those exhibits were misplaced in the Court's filing system.  The Court requested that Defendants' counsel provide another copy of the videos, which counsel did on August 5, 2024.  *See* ECF No. 98-2.  Defendants' counsel sent a copy of the August 5, 2024 transmittal letter to Plaintiff so that he would be aware of the correspondence with the Court, even though that correspondence was not substantive.  On September 16, 2024, Plaintiff wrote to the Court to object to the resubmission of the videos because he was not provided with additional copies at that time.  These videos are identical to the videos Plaintiff received during discovery, however, and were only being resubmitted to the Court due to a clerical error; it was not necessary for Defendants' counsel to provide a duplicate copy of the videos to Plaintiff in August 2024.

[7] Carey Declaration Exhibit V consists of three separate videos: (i) Law Library Video #1, which is divided into four separate, continuous segments; (ii) Booking Video #1; and (iii) North East Block Video, which is divided into two separate, continuous segments.

Because of the suspicious activity, Sgt. Lombardo directed C.O. Rodrigues and C.O. Curry to return to the library to perform a second search of Plaintiff.  Defs.' 56.1 Statement ¶ 50.  About 10-15 minutes after having conducted the first search, the officers returned to the library, where C.O. Curry performed a second pat frisk[8] of Plaintiff.  Defs.' 56.1 Statement ¶¶ 52-53; Pl.'s Dep #1 at 16:16-24; Law Library Video #1 at 20:05:16.95; 20:06:25.03 - 20:06:47.41.  During the pat frisk, C.O. Curry checked the inside of Plaintiff's waistband with the back of his hand, which, according to Plaintiff, resulted in C.O. Curry inappropriately touching him "from the rear."  Defs.' 56.1 Statement ¶¶ 54-55; Pl.'s Dep. #1 at 16:25-17:18, 27:17-28:2, 28:25-30:12; Law Library Video #1 20:06:25.03 - 20:06:47.41.  Plaintiff testified that he did not think the search was inappropriate at the time it was conducted, but came to think it was inappropriate after the fifth search was conducted later that day.  Pl.'s Dep. #1 at 16:25-17:4, 27:17-28:12, 30:13-31:5.  C.O. Curry's check of Plaintiff's waistband lasted two to three seconds.  Defs.' 56.1 Statement ¶ 54; Pl.'s Dep. #1 at 30:3-12.  C.O. Curry and C.O. Rodrigues also searched the accordion file folder from which Plaintiff had removed an item earlier.  Defs.' 56.1 Statement ¶ 57; Law Library Video #1 at 20:05:48.62 - 20:07:54.03.  In total, this second search lasted about 22 seconds.  Defs.' 56.1 Statement ¶ 53.

### c.    Third Search

While the second search of Plaintiff was in progress, Sgt. Lombardo informed Capt. Abrams that he had ordered the second search.  *Id.* ¶ 51.  Capt. Abrams reviewed the video of both the first and second searches on his computer.  *Id.* ¶ 58; Abrams Aff. ¶¶ 23-26.  At this time, Capt. Abrams was aware that Plaintiff had previously been disciplined for possessing and hiding

---

[8] Defendants seem to use the terms "pat down" and "pat frisk" interchangeably in their motion papers.  The Court has reviewed video of the May 19, 2017 searches, *see* Carey Decl. Ex. V, and finds no meaningful difference between the acts that these terms are used to describe.

contraband, though he did not know the exact details. Defs.' 56.1 Statement ¶ 59; Abrams Aff. ¶ 27. After watching the video, Capt. Abrams instructed C.O. Rodrigues and C.O. Curry to take Plaintiff to the male booking area of the New Jail so that a strip search could be performed. Defs.' 56.1 Statement ¶ 60; Abrams Aff. ¶ 28. Five to ten minutes after the second search, the officers returned to the law library. Defs.' 56.1 Statement ¶ 61; Pl.'s Dep. #1 at 17:22-18:5; Law Library Video #1 at 20:14:13.15. Before bringing Plaintiff to the booking area, they conducted a search of the corner of the library that was not visible on the closed-circuit video system. Defs.' 56.1 Statement ¶ 62; Abrams Aff. ¶ 29; Pl.'s Dep. #1 at 18:5-9; Law Library Video #1 at 20:14:24.27 - 20:20:32.71. They then placed Plaintiff in handcuffs and escorted him to the male booking area of the New Jail to conduct a strip search. Defs.' 56.1 Statement ¶ 63; Abrams Aff. ¶ 30; Pl.'s Dep. #1 at 18:5-11; Law Library Video #1 at 20:20:39.14 - 20:21:03.25.

### d.    Fourth Search

Once Plaintiff arrived in the booking area, he was instructed to remove his clothes. Pl.'s Dep. #1 at 18:11-13; Carey Decl. Ex. V ("Booking Video #1") at 20:23:21.78 - 20:28:03.56. While Plaintiff undressed, Sgt. McWilliams, the supervisor on duty, entered the room where Plaintiff was being searched. Defs.' 56.1 Statement ¶ 66; Pl.'s Dep. #1 at 18:13-16. According to Plaintiff, "as a joke . . . [Sgt. McWilliams] stated . . . 'as naked as you are with the pole that's in front of us, you might as well dance' . . . ." Defs.' 56.1 Statement ¶ 67; Pl.'s Dep. #1 at 18:16-19:10. Plaintiff also testified that C.O. Curry made a verbal sexual comment relating to Sgt. McWilliams's "joke," but he did not recall specifically what C.O. Curry said. Pl.'s Dep. #1 at 38:17-39:13; Defs.' 56.1 Statement ¶ 68. Nothing was found during the five-minute-long search. Defs.' 56.1 Statement ¶¶ 65, 70; Booking Video at 20:23:21.78 - 20:28:03.56. Aside from the statements allegedly made by Sgt. McWilliams and C.O. Curry, Plaintiff does not contend that the strip search was conducted in an inappropriate manner. Defs.' 56.1 Statement ¶ 69. After

the strip search was completed, C.O. Curry and C.O. Rodrigues escorted Plaintiff back to the law library as instructed by Capt. Abrams.  Defs.' 56.1 Statement ¶¶ 73-74; Booking Video at 20:28:05.60.

### e.    Fifth Search

Later that night, Capt. Abrams ordered a search of the entire housing block located on the northeast wing of the second floor of the New Jail, where Plaintiff was housed at the time. Defs.' 56.1 Statement ¶ 75; Abrams Aff. ¶ 41; Carey Decl. Ex. V ("North East Block Video") at 22:16:17.75.  C.O. Rodrigues and C.O. Curry arrived to search Plaintiff's cell.  Defs.' 56.1 Statement ¶ 81; Pl.'s Dep. #1 at 19:11-20:2.  C.O. Curry handcuffed Plaintiff's hands behind his back and took him out of his cell.  Defs.' 56.1 Statement ¶ 83; Pl.'s Dep. #1 at 19:21-24.  C.O. Rodrigues then searched inside of the cell.  Defs.' 56.1 Statement ¶ 84; Pl.'s Dep. #1 at 19:24-20:2.  Plaintiff testified that while he was outside of his cell, C.O. Curry performed another pat frisk, during which C.O. Curry again inappropriately touched his rear.  Defs.' 56.1 Statement ¶ 85; Pl.'s Dep. #1 at 20:2-6; 34:9-35:10.  According to Plaintiff, this alleged inappropriate touching lasted approximately two to three seconds.  Pl.'s Dep. #1 at 35:3-10; Defs.' 56.1 Statement ¶ 86.  Plaintiff testified that C.O. Curry laughed in response to something Plaintiff said during the second touch during the fifth search on May 19, 2017, but did not recall what exactly he had said to elicit the laughter.  *See* Pl.'s Dep. #1 at 34:3-8.  Plaintiff contends that he immediately complained about the inappropriate touching to Captain Bruce Donnelly.  Defs.' 56.1 Statement ¶ 89; Pl.'s Dep. #1 at 20:2-12.  At the conclusion of the search, Plaintiff was brought back into his cell, the handcuffs were removed, and the officers left.  Defs.' 56.1 Statement ¶ 90.  The entire block search lasted approximately 20 minutes.  North East Block Video at 22:16:17.75 - 22:36:27.65.  No contraband was found during the search of Plaintiff's cell.  Defs.' 56.1 Statement ¶ 91.

### f.    Grievance Related to the May 19, 2017 Searches

On May 22, 2017, Plaintiff filed an inmate grievance regarding the May 19, 2017

searches.  Carey Decl. Ex O ("May 19 Grievance").  In his grievance, Plaintiff described the five

searches discussed above.  May 19 Grievance at 1-2.  He alleged that the actions of C.O. Curry,

C.O. Rodrigues, and Sgt. McWilliams constituted harassment, retaliation, and sexual harassment,

as well as violations of his constitutional rights.  *Id.*  Plaintiff testified that he did not believe any

of the searches conducted on May 19, 2017 were "illegal," but stated that his being subjected to

the repeated searches was "excessive, inappropriate, [and] unprofessional."  Pl.'s Dep. #1 at

63:10-23.

### 2.    June 8, 2017 Strip Search

On June 8, 2017, Sgt. Torres received information from an informant that while in the

law library, Plaintiff had received tobacco from another inmate.  Defs.' 56.1 Statement ¶ 94;

Carey Decl. Ex. AC ("Torres Aff.") ¶ 3.  After receiving this information, Sgt. Torres used the

WCJ closed-circuit video system to observe Plaintiff in the law library.  Defs.' 56.1 Statement ¶

95; Torres Aff. ¶ 4.  Sgt. Torres saw inmate Michael Jiminez ("Jiminez") remove items from

Plaintiff's bag, which Jiminez then put down the front of his shirt.  Defs.' 56.1 Statement ¶¶ 96-

97; Torres Aff. ¶ 4; Carey Decl. Ex. W ("Law Library Video #2") at 7:35:02 - 7:35:47.[9]  Sgt.

Torres notified Sgt. Allen about what he had seen.  Defs.' 56.1 Statement ¶ 97; Torres Aff. ¶ 5.

Sgt. Allen then ordered C.O. Halloran and C.O. Olivo to search Jiminez for weapons and

contraband.  Defs.' 56.1 Statement ¶ 98; Carey Decl. Ex. AB ("Allen Aff.") ¶ 5.  Jiminez was

found to be in possession of the items Sgt. Torres saw him remove from Plaintiff's bag, which

---

[9] Carey Declaration Exhibit W consists of two separate videos: (i) Law Library Video #2,
which is divided into three separate, continuous segments; and (ii) Booking Video #2.

turned out to be items from the jail commissary. Defs.' 56.1 Statement ¶ 99; Allen Aff. ¶¶ 3, 5.

Inmates are prohibited from "giving or 'selling' their commissary to each other unless approved

by the D/C of Operations or [his/her] designee." Inmate Handbook at 7.

Sgt. Allen, C.O. Halloran, and C.O. Olivo then went to the law library and asked Plaintiff

if he had any contraband on him; Plaintiff answered that he did not. Defs.' 56.1 Statement ¶¶

100-01; Allen Aff. ¶ 8; Law Library Video #2 at 7:50:25 - 7:50:58. Sgt. Allen then ordered that

Plaintiff be strip searched because he might possibly have contraband on his person. Defs.' 56.1

Statement ¶ 102; Allen Aff. ¶ 12. Plaintiff was escorted to the New Jail booking area to be strip

searched; a search of the law library was performed while Plaintiff was being strip searched.

Defs.' 56.1 Statement ¶¶ 103-04; Allen Aff. ¶¶ 9-11; Carey Decl. Ex Y ("Halloran Aff.") ¶¶ 4-5;

Carey Decl. Ex. Z ("Olivo Aff.") ¶¶ 4-5; Law Library Video #2 at 07:50:58, 8:13:41 - 8:25:17.

The June 8, 2017 strip search lasted for several minutes. Carey Decl. Ex. W ("Booking Video

#2") at 08:05:55 - 08:09:33. Plaintiff took issue with certain instructions given during the strip

search—specifically, that he was told to "bend over, spread them" rather than to "squat and

cough"—but does not otherwise contend that the search was inappropriate. Defs.' 56.1

Statement ¶¶ 107-08; Pl.'s Dep. #2 at 63:21-64:24. Plaintiff asserts that this strip search was

ordered in retaliation for his having filed a grievance on May 22, 2017 regarding the events of

May 19, 2017. Defs.' 56.1 Statement ¶ 111. No contraband was found during the strip search,

and Plaintiff was returned to the law library after the search was conducted. Defs.' 56.1

Statement ¶¶ 109-10; Allen Aff. ¶¶ 16-17; Law Library Video #2 at 8:28:32.

On June 9, 2017, Plaintiff filed an inmate grievance regarding the events described

above. Carey Decl. Ex. P ("June 8 Grievance") at 2-3. Plaintiff alleged that the actions of C.O.

Halloran, C.O. Olivo, Sgt. Allen, and Sgt. McWilliams were malicious and undertaken in

retaliation for Plaintiff exercising his rights to access the law library.  *Id.*  He also alleged that the searches violated his constitutional rights.  *Id.*

### 3.    Legal Materials Searches

Plaintiff alleges that four separate searches of his person and his legal materials that occurred in the law library on August 8, August 15, and October 6, 2017 were improper.  ECF No. 2 at pdf pg. 13-15.[10]

### a.    The August 8, 2017 Searches

Plaintiff was first searched in the law library on August 8, 2017 at approximately 6:39 p.m.  Defs.' 56.1 Statement ¶¶ 114-15.  C.O. Archer searched through Plaintiff's legal documents; confiscated Plaintiff's two writing pens; failed to issue a confiscation or contraband slip; and performed the search and confiscation without a supervisor present.  ECF No. 73 at 4; Carey Decl. Ex AA ("Archer Aff.") ¶¶ 6-8.

Later that same evening, as Plaintiff was leaving the law library, Sgt. Torres searched Plaintiff's legal materials again.  Defs.' 56.1 Statement ¶¶ 118-19.  Sgt. Torres removed from Plaintiff's legal materials nine legal documents printed on pink paper; made copies of these pink legal documents on plain white paper; provided the plain white copies to Plaintiff; and retained the pink originals.  ECF No. 73 at 4; Torres Aff. ¶¶ 9-11; Pl.'s Dep. #2 at 14:9-22, 16:5-18:10.

---

[10] As set forth in the Court's April 28, 2023 Decision and Order, surveillance videos for these four searches was not preserved.  *See* ECF No. 73 at 3.  As a sanction for Defendants' failure to preserve these videos, the Court ordered that Defendants "be deemed to have admitted certain facts alleged in the Complaint with respect to those videos."  *Id.* at 8.  Specifically, Defendants are deemed to have admitted the facts recited at pages 4-5 of that Decision and Order.  *See id.*  These facts "effectively adopt the relevant facts as presented by Plaintiff in the Complaint regarding what would have been visible in the videos of the four searches, albeit without conceding any facts related to Defendants' state of mind or the propriety of their actions."  *Id.* at 8-9.  Accordingly, where appropriate, the Court refers and cites to these facts that have been deemed admitted in reciting the facts that are not in dispute for Plaintiff's claims regarding these searches.

Sgt. Torres retained the original pink copies because inmate passes at the WCJ are printed on pink paper, and inmates are therefore not permitted to possess other pink colored paper. Defs.' 56.1 Statement ¶¶ 120-21; Torres Aff. ¶ 13.

Plaintiff filed two grievances regarding the August 8 library searches. Carey Decl. Ex. Q ("August 8 Grievance #1"); Carey Decl. Ex. R ("August 8 Grievance #2"). Plaintiff alleged that the first search interfered with his access to the law library and constituted harassment that was being ordered by the "District Attorney's Office of White Plains." August 8 Grievance #1 at 1, 3.

### b.    The August 15, 2017 Search

On August 15, 2017, Plaintiff's legal materials were searched by C.O. Archer as he entered the law library. ECF No. 73 at 4; Defs.' 56.1 Statement ¶ 123; Archer Aff. ¶¶ 16-17. C.O. Archer also searched Plaintiff's legal materials when he exited the law library, and, in doing so, removed paper clips. ECF No. 73 at 4; Defs.' 56.1 Statement ¶ 127; Archer Aff. ¶¶ 19, 24. In addition, C.O. Archer searched the legal materials of a second "white Caucasian" inmate twice—once upon that inmate's entry into the law library, and once upon his exit—yet declined to search two African American prisoners upon their entry into and exit from the law library. ECF No. 73 at 4; Archer Aff. ¶¶ 21-23; Pl.'s Dep. #2 at 31:4-32:3.

On August 16, 2017, Plaintiff filed a grievance related to the events of August 15. Carey Decl. Ex. S ("August 15 Grievance"). Plaintiff asserted that C.O. Archer acted with deliberate racial bias in choosing to search him and the other Caucasian inmate while electing not to search the two African American inmates.[11] August 15 Grievance at 4, 6; Pl.'s Dep. #2 at 36:4-25. The

---

[11] At his deposition, Plaintiff testified that he is of Hispanic and European descent, and considers himself a white Caucasian. *See* Pl.'s Dep. #2 at 35:11-35:18. He also noted that C.O. Archer is an African American woman. *See id.* at 36:4-36:25.

August 25, 2017 response to Plaintiff's grievance notes that it is WCDOC policy to "check all inmate property upon admission and departure from the law library."  Defs.' 56.1 Statement ¶ 128; August 15 Grievance at 8.  It also notes that one of the two African American inmates who was not searched was not carrying any legal materials, and the other was carrying a single sheet of white paper.  Defs.' 56.1 Statement ¶ 126; August 15 Grievance at 8.

### c.    The October 6, 2017 Search

On October 6, 2017, Plaintiff was again searched by C.O. Archer in the law library.  Defs.' 56.1 Statement ¶ 130; Archer Aff. ¶¶ 25-31.  C.O. Archer ripped the folder in which Plaintiff's legal materials were held; confiscated the book notes that Plaintiff used to mark his legal pages; removed from Plaintiff's legal materials certain legal documents printed on pink paper; made copies of Plaintiff's pink legal documents on plain white paper; provided the plain white copies to Plaintiff; and retained the pink originals.  ECF No. 73 at 4-5.  C.O. Archer determined that Plaintiff's post-it notes and pink paper were contraband.  Defs.' 56.1 Statement ¶ 131; Archer Aff. ¶ 29.

On October 7, 2017, Plaintiff filed a grievance regarding this search, in which he claimed that C.O. Archer's actions were retaliatory and constituted continued harassment.  Carey Decl. Ex. T ("October 6 Grievance") at 4, 6.

### B.    "Old Jail" Conditions of Confinement

Some of Plaintiff's claims result from his protests about the conditions of confinement he experienced in the WCJ's Old Jail section.  On June 24, 2016, while he was being held as a pretrial detainee, Plaintiff lodged a grievance listing multiple objections to the conditions in the Old Jail.  Carey Decl. Ex. N ("Old Jail Grievance").  Among other things, Plaintiff asserted that he was: (i) confined to his cell 18 to 21 hours per day; (ii) served meals inside of his cell; (iii) only sometimes granted access to the dayroom for recreation; (iv) only sometimes given access

to a shower; and (v) only allowed access to a telephone at the discretion of the block assigned jail guard. Defs.' 56.1 Statement ¶ 17; Old Jail Grievance at 1-2. According to Plaintiff, he and the other inmates housed in the Old Jail were treated differently than the inmates housed in WCJ's New Jail, where inmates are afforded more time outside of their cells and can make telephone calls, take showers, and access the dayrooms freely. Defs.' 56.1 Statement ¶ 17; Old Jail Grievance at 1-2; Pl.'s Dep. #2 at 91:21-92:20. Plaintiff also maintains that inmates were not assigned housing at the WCJ based on their inmate classification, but rather at random. Defs.' 56.1 Statement ¶ 25; Pl.'s Dep. #2 at 92:21-93:14. The longest Plaintiff went without access to a shower was one day, and the longest he went without access to a telephone was two days. Defs.' 56.1 Statement ¶¶ 26-27; Pl.'s Dep. #2 at 94:10-95:11.

A WCJ employee named Sgt. Middleton denied Plaintiff's grievance, and in doing so informed him that the WCJ's Old Jail is operated differently than other sections due to its "physical plant limitation." Defs.' 56.1 Statement ¶ 18; Old Jail Grievance at 1; Carey Decl. Ex X ("Vollmer Aff.") ¶ 3. Sgt. Middleton explained that the Old Jail, unlike the WCJ's other sections, cannot safely and securely accommodate an entire housing unit in the dayrooms or common areas. Defs.' 56.1 Statement ¶¶ 13, 18; Old Jail Grievance at 1; Vollmer Aff. ¶ 4. As a result of these limitations, inmates in the Old Jail are often confined to their cell for more hours per day than inmates housed in other sections of the WCJ. Defs.' 56.1 Statement ¶ 14; Vollmer Aff. ¶ 5. Plaintiff appealed the denial of his grievance to Asst. Warden Vollmer, who upheld the denial; Plaintiff then appealed that decision to the NYSCOC, which also upheld the denial. Defs.' 56.1 Statement ¶¶ 19-22.

## II.    Procedural History

Plaintiff initiated this action on August 23, 2018. ECF Nos. 1-3. By letter and supporting affirmation dated July 7, 2023, Defendants confirmed that they served their motion

14

for summary judgment and all supporting papers on Plaintiff on that date.  ECF Nos. 81, 81-1.

Defendants received service of Plaintiff's opposition submission on September 27, 2023, *see*

ECF No. 84, and Defendants served a short reply letter on October 3, 2023, *see* ECF Nos. 91, 91-

1.  All of the motion papers were docketed on October 3, 2023.  ECF Nos. 85-89, 91.  Plaintiff

filed a sur-reply letter on November 3, 2023.  *See* ECF No. 93.  Even though Plaintiff did not

seek leave to file this sur-reply submission, the Court has considered the sur-reply in full as part

of its evaluation of this motion.

## LEGAL STANDARDS FOR SUMMARY JUDGMENT

### I.    Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be

granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 320-23 (1986).  A dispute about a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine

issue of material fact exists, a court is required to "resolv[e] all record ambiguities and draw[] all

factual inferences in favor of the non-moving party."  *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135,

145 (2d Cir. 2007); *see also Anderson*, 477 U.S. at 261 n.2; *Mount Vernon Fire Ins. Co. v. Belize*

*NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002).  A party cannot overcome summary judgment by

relying on "mere speculation or conjecture as to the true nature of the facts" because "conclusory

allegations or denials" cannot "create" genuine disputes of material fact "where none would

otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks omitted).

Nor can a party opposing summary judgment "rest on the allegations or denials of his pleading."

*Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  Moreover, "[c]redibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255; *accord Williams v. N.Y.C. Housing Auth.*, 61 F.4th 55, 76 (2d Cir. 2023). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of N.Y.*, 957 F.2d 961, 975 (2d Cir. 1992) (citing *H.L. Hayden Co. v. Siemens Med. Sys. Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989)).

## II.    Filings by *Pro Se* Litigants

In cases involving *pro se* litigants, on a motion for summary judgment, the court reads the submissions of the *pro se* party "liberally and interpret[s] them to raise the strongest arguments that they suggest." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (quotation marks omitted). Nonetheless, application of this different standard "does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence are insufficient to overcome a motion for summary judgment." *Gunn v. Milani*, No. 20-cv-2681 (KMK), 2024 WL 4124319, at *7 (S.D.N.Y. Sept. 9, 2024) (cleaned up).[12]

## DISCUSSION

Plaintiff's claims against Defendants are made pursuant to 42 U.S.C. § 1983. That statute provides, in relevant part, that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured

---

[12] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009), and Local Civil Rule 7.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, copies of this case and other cases that are unpublished or only available by electronic database are being simultaneously mailed to the *pro se* Petitioner along with this Decision and Order.

. . . .” 42 U.S.C. § 1983. “[T]his language does not create substantive rights; rather, it creates a mechanism by which individuals can vindicate the violation of rights secured elsewhere.” *Santucci v. Levine*, No. 17-cv-10204 (PMH), 2021 WL 76337, at *3 (S.D.N.Y. Jan. 8, 2021). The Court will address each of Plaintiff's claims for relief in turn.

**I.    Claims Arising from Allegedly Improper Searches**

Defendants seek dismissal of the claims related to the allegedly improper searches conducted on May 19, June 8, August 8, August 15, and October 6, 2017. *See* ECF No. 88 (“Defs.’ Mem.”) at 9-20. These include claims for improper strip searches, sexual abuse, an improper cell search, retaliation, interference with access to the courts, and an equal protection violation.

**A.    Strip Search Claims**

Plaintiff contends that the May 19 and June 8, 2017 strip searches violated his rights under the Fourth Amendment. ECF No. 90-1 (“Pl.’s Opp.”) at 6-7; *see* Defs.’ Mem. at 9-11.

**1.    Legal Standard**

“There is a long-established principle that the routine, random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment.” *Layne v. Panzarella*, No. 19-cv-04531 (PMH), 2022 WL 2343184, at *5 (S.D.N.Y. June 29, 2022); *see Castro-Sanchez v. New York State Dep’t of Corr. Servs.*, No. 10-cv-8314 (DLC), 2011 WL 6057837, at *8 (S.D.N.Y. Dec. 6, 2011) (“*Castro-Sanchez I*”). The Supreme Court has held that the Fourth Amendment does not require probable cause for corrections officials to conduct strip searches of inmates; instead, such searches are subject to a reasonableness standard.” *Peek v. City of New York*, No. 13-cv-4488 (AJN), 2014 WL 4160229, at *1 (S.D.N.Y. Aug. 18, 2014). That said, “inmates retain a limited right to bodily privacy under the Fourth Amendment.” *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016); *see Torres v. City of New York*, No. 17-cv-6604 (GBD) (DCF),

2019 WL 4784756, at *5 (S.D.N.Y. Sept. 30, 2019). "Where an inmate challenges an isolated

search, courts typically apply the standard set forth in *Bell v. Wolfish,* 441 U.S. 520[] (1979)."

*Harris*, 818 F.3d at 58. "In determining whether a particular strip search is reasonable, the Court

considers 'the scope of the particular intrusion, the manner in which it is conducted, the

justification for initiating it, and the place in which it is conducted.'" *Jean-Laurent v. Wilkerson*,

438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006) (quoting *Bell*, 441 U.S. at 559), *aff'd*, 461 F. App'x

18 (2d Cir. 2012) (summary order). "The *Bell* four-factor test of reasonableness requires

balancing the need for the search at issue against the invasion of personal rights associated with

the search." *Torres*, 2019 WL 4784756, at *5. "An inmate bears the burden of showing that a

search was unreasonable." *Peek*, 2014 WL 4160229, at *2.

### 2.    Analysis

Based on the record presented to the Court and the application of the *Bell* factors, the

strip searches of Plaintiff conducted on May 19, 2017 and June 8, 2017 were reasonable as a

matter of law, and Plaintiff's claims regarding these searches must be dismissed.

The uncontroverted evidence submitted in connection with this motion reveals that the

May 19, 2017 strip search was performed because of Plaintiff's suspicious activity during the

first and second searches conducted that day, combined with Plaintiff's prior disciplinary

infractions. *See* Defs.' 56.1 Statement ¶¶ 47-50, 58-60. Plaintiff was observed on video

removing an unidentified object from an accordion file folder and then moving out of view of the

law library camera. *Id.* ¶ 48. After having reviewed the video, and aware of Plaintiff's

disciplinary history, Capt. Abrams ordered Plaintiff to be strip searched. *Id.* ¶ 60; Abrams Aff. ¶

28.

The evidence demonstrates that the June 8, 2017 search was performed based on a

sequence of events that began with Sgt. Torres observing inmate Jiminez remove items from

Plaintiff's bag and place them down the front of his shirt; these items were found on Jiminez after a search, and were determined to be prohibited commissary. Defs.' 56.1 Statement ¶¶ 95-99. Sgt. Allen subsequently ordered Plaintiff to be strip searched in case he was hiding other contraband on his person. *Id.* ¶ 102; Allen Aff. ¶ 12. In his grievance regarding the June 8 search, Plaintiff contended that the actions of C.O. Halloran, C.O. Olivo, Sgt. Allen and Sgt. McWilliams were malicious and retaliatory. June 8 Grievance at 2-3.

### a.    The Scope of the Intrusion

In assessing the scope of the intrusion posed by a search, courts consider (1) the type of search, and (2) the sex of the person conducting it. *See Harris*, 818 F.3d at 58-59. "While all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." *Id.* at 59 (cleaned up). The parties refer to the searches at issue as "strip searches," *see* Defs. 56.1 Statement ¶¶ 64-74, 94-111; May 19 Grievance at 2; Pl.'s Dep #2 at 71:13-19, which generally refers to "an inspection of a naked individual, without any scrutiny of the subject's body cavities," *Harris*, 818 F.3d at 58; while this type of search is undoubtedly intrusive, it is considered somewhat less intrusive than either a visual or manual body cavity search. There is also no dispute that the two searches were conducted by officers of the same sex as Plaintiff. *See* May 19 Grievance at 3 (stating that C.O. Curry and C.O. Rodrigues conducted the strip search, with Sgt. McWilliams also present.); June 8 Grievance at 2 (stating that C.O. Halloran, C.O. Olivo, Sgt. Allen, and Sgt. McWilliams conducted the strip search). Accordingly, the first *Bell* factor weighs in favor of the reasonableness of the searches.

### b.    The Manner in Which the Searches Were Conducted

"A strip search conducted in a professional manner is more reasonable than one that is not." *Harris*, 818 F.3d at 59-60. There is no allegation—let alone any evidence in the record—

that Plaintiff was inappropriately touched during either of the two strip searches.  *See Sankara v. Plaskett*, No. 15-cv-8470 (KBF), 2017 WL 4444250, at *3 (S.D.N.Y. Oct. 4, 2017) (granting summary judgment for defendants on a strip search claim where plaintiff made "no allegations of force or other abusive behavior").  Plaintiff does, however, take issue with comments allegedly made by Sgt. Williams and C.O. Curry during the May 19 strip search, Def.'s 56.1 Statement ¶¶ 67-68; Pl.'s Dep. #1 at 18:16-19:10, 38:17-39:13, and certain instructions given by C.O. Olivo during the June 8 search, Defs.' 56.1 Statement ¶¶ 107-08; Pl.'s Dep. #2 at 63:21-64:24.  But these statements are insufficient to create a genuine issue of material fact as to whether the strip searches were reasonable.  *See Malik v. City of New York*, No. 11-cv-6062 (PAC) (FM), 2012 WL 3345317, at *13 (S.D.N.Y. Aug. 15, 2022) (finding, on a motion to dismiss, that an inmate failed to state a claim for an unreasonable strip search where he alleged that the officers conducting the search made disparaging comments, but did not allege sexual or physical abuse), *adopted by*, 2012 WL 4475156 (S.D.N.Y Sep. 28, 2012).  Though Plaintiff stated that his being subjected to multiple searches, including the strip search on May 19 was, in his opinion, unprofessional, Pl.'s Dep. #1 at 63:10-23, he did not testify or provide other evidence to show that either the strip search on that day or the strip search on June 8 was conducted in such an unprofessional or inappropriate manner as to make the searches unreasonable.  The second *Bell* factor therefore also weighs in favor of finding the searches reasonable.

### c.    The Justification for the Searches

The record before the Court makes clear that both strip searches were conducted for legitimate penological purposes.  WCJ officials ordered the May 19 strip search based on Plaintiff's suspicious behavior during the first two searches of Plaintiff that day, combined with Capt. Abrams's knowledge of Plaintiff's disciplinary history.  *See* Defs.' 56.1 Statement ¶¶ 58-60; Abrams Aff. ¶¶ 23-28.  Plaintiff does not dispute the facts supporting the justification for the

May 19 strip search—in fact, he acknowledges the accuracy of some of these core facts, *see* Pl.'s Dep. #1 at 67:19-20; 24:13-25:15.  According to the uncontroverted evidence in the record, the June 8 strip search was conducted based on (i) the information Sgt. Torres received from an informant; (ii) Sgt. Torres's observations of inmate Jiminez removing contraband from Plaintiff's bag; (iii) the search of Jiminez that turned up that same contraband, and (iv) the possibility that Plaintiff was in possession of other contraband.  Def.'s 56.1 Statement ¶¶ 94-102; Torres Aff. ¶¶ 4-5.  These justifications are sufficient to support a finding that the searches were reasonable.  *Torres*, 2019 WL 4784756, at *5 (finding that a strip search based on "observations of Plaintiff's conduct" was reasonable and served a legitimate penological purpose).  The third *Bell* factor weighs in favor of reasonableness.

### d.    The Place Where the Searches Were Conducted

Both strip searches were conducted in private booths in the male booking area of the WCJ.  Defs.' 56.1 Statement ¶¶ 63-66, 103-04; *see* Booking Video #1; Booking Video #2.  Conducting a strip search in a private location out of view of other inmates also supports a finding that the searches were reasonable.  *See Harris*, 818 F.3d at 62 (stating that searches "conducted in the presence of only those individuals needed to conduct the search" are more reasonable than searches conducted in the presence of unnecessary spectators); *Carzoglio II*, 2022 WL 2193376, at *5.  The fourth *Bell* factor also weighs in favor of the reasonableness of the searches.

* * * * * * * * * *

Because each of the *Bell* factors weighs in favor of finding that the strip searches at issue were reasonable based on the undisputed facts before the Court, Defendants' motion for summary judgment as to Plaintiff's strip search claims is GRANTED.

### B.    Sexual Abuse Claim

Plaintiff's sexual abuse claim is based on the alleged conduct of certain Defendants during the second and fifth searches conducted on May 19, 2017.  Pl.'s Dep. #1 at 16:25-17:18, 20:2-6, 27:17-28:2, 28:25-30:12, 34:9-35:10.

### 1.    Legal Standard

"[S]exual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment."  *Boddie v. Schnieder*, 105 F.3d 857, 860-61 (2d Cir. 1997).  Under the Eighth Amendment, conditions of confinement "must not involve the wanton and unnecessary infliction of pain."[13]  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  In order to prevail on a claim for an Eighth Amendment violation, a prisoner must demonstrate that a defendant acted with a sufficiently culpable state of mind, and that the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions.  *See Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015).  "In determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate."  *Id*. at 257-58.

---

[13] Based on Plaintiff's January 30, 2017 guilty plea, Plaintiff was a convicted prisoner at the time of the searches on May 19, 2017.  Accordingly, Plaintiff's sexual abuse claim and his improper cell search claim are governed by the Eighth Amendment.  *See Morrison v. United States*, No. 17-cv-6779 (WHP), 2019 WL 5295119, at *4 (S.D.N.Y. Oct. 18, 2019) (applying the Eighth Amendment to claims brought on behalf of an inmate who had pled guilty and was awaiting sentencing at the time the events giving rise to the claims).

###### 2.      Analysis

Plaintiff asserts that he was sexually abused by C.O. Curry when Curry pat frisked him during the second search on May 19, 2017, and again during the fifth search later that day. *See* Defs.' 56.1 Statement ¶¶ 54-55, 85-86; Pl.'s Dep. #1 at 16:25-17:18, 20:2-6, 28:25-30:12, 34:9-35:10. Neither of the contacts by C.O. Curry is sufficient to sustain a claim for sexual abuse. Plaintiff has not provided evidence sufficient to show that C.O. Curry's conduct was objectively serious for purposes of establishing an Eighth Amendment violation. Plaintiff testified that C.O. Curry touched him for no more than three seconds while conducting the second search, and for two to three seconds in the course of the fifth search. *See* Defs.' 56.1 Statement ¶¶ 54-55, 85-86; Pl.'s Dep. #1 at 30:3-12, 35:3-10. Courts in this District have "consistently found such brief contact fails to establish an Eighth Amendment violation" for sexual abuse as a matter of law. *Carzoglio II*, 2022 WL 2193376, at *6 (collecting cases); *Vann v. Sudranski*, No. 16-cv-7367 (VB), 2020 WL 3001072, at *6 (S.D.N.Y. June 4, 2020) (holding that "brief contact with plaintiff's genital area during a routine and necessary pat frisk" was insufficient to establish an Eighth Amendment sexual abuse claim); *Castro-Sanchez v. New York State Dep't of Corr. Servs.*, No. 10-cv-8314, 2012 WL 4474154, at *3 (S.D.N.Y. Sept. 28, 2012) (finding that a brief groping of an inmate's buttocks was insufficient to support an Eighth Amendment claim). And even if the challenged conduct were objectively serious, Plaintiff has failed to present evidence that C.O. Curry acted with a sufficiently culpable state of mind. Plaintiff testified that C.O. Curry laughed in response to something Plaintiff said during the second touch during the fifth search on May 19, 2017, but did not recall what exactly he had said to elicit the laughter. *See* Pl.'s Dep. #1 at 34:3-8. Regardless, this is not enough to raise an issue of material fact as to C.O. Curry's subjective culpability. *See Carzoglio II*, 2022 WL 2193376, at *8.

23

Even viewing the facts in the light most favorable to Plaintiff, Plaintiff has failed to come forward with sufficient evidence to satisfy either prong of the Eighth Amendment standard. Defendants' motion for summary judgment as to the Eighth Amendment sexual abuse claim is GRANTED.

### C.     First Amendment Retaliation Claim

Plaintiff claims that the May 19, 2017 searches were conducted in retaliation for his having filed a prior grievance, *see* May 19 Grievance at 2, and asserts that the June 8, 2017 strip search was undertaken in retaliation for his having filed a grievance on May 22, 2017 regarding the May 19, 2017 searches, Defs.' 56.1 Statement ¶ 111; June 8 Grievance at 3, Pl.'s Opp. at 7 (describing these searches as part of a pattern of retaliation).  Plaintiff also contends, in a wholly conclusory manner, that the August 15 and October 6, 2017 searches were retaliatory.  August 15 Grievance at 6; October 6 Grievance at 6.

### 1.     Legal Standard

"To prove a First Amendment retaliation claim under Section 1983, a prisoner must show (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009).  "The First Amendment protects prisoners from retaliation for filing grievances." *Castro-Sanchez I*, 2011 WL 6057837, at *11.  "To be an adverse action, retaliatory conduct must be the type that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (cleaned up).  Courts assess adverse action by "look[ing] to the specific circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Id*.  To satisfy the causation prong, a plaintiff's

allegations must be "sufficient to support the inference that his [or her] filing of grievances played a substantial part in the adverse action." *Kotler v. Boley*, No. 21-1630, 2022 WL 4589678, at *2 (2d Cir. Sept. 30, 2022) (summary order) (cleaned up).

In the prison context, the Second Circuit has made clear that because of the "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, [courts] examine prisoners' claims of retaliation with skepticism and particular care." *Hayes*, 976 F.3d at 272.

### 2.    Analysis

There is no dispute that Plaintiff's filing of grievances qualifies as protected speech, and that he can therefore establish the first element of this claim. *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015). With respect to the May 19, 2017 searches, however, Plaintiff has failed to put forward sufficient evidence to demonstrate that the searches were an "adverse action" that would deter Plaintiff from exercising his constitutional rights, or that that there was a causal connection between the Old Jail Grievance and these searches. Not only did Plaintiff file a grievance just days after the May 19 search, but he also filed multiple additional grievances regarding additional matters in the ensuing months. Clearly, Plaintiff was not at all deterred from exercising his First Amendment rights as a result of the May 19 searches. *See Garcia v. Watts*, No. 08-cv-7778 (JSR) (HBP), 2009 WL 2777085, at *10 (S.D.N.Y. Sept. 1, 2009) (finding no adverse action in part because plaintiff continued to file grievances after the alleged retaliatory incident). Moreover, the undisputed evidence in the record makes clear that certain of the searches were not directed at Plaintiff alone—the first search involved searches of all inmates in the library area, and the fifth search began as a search of the entire housing block where Plaintiff was housed, *see* Defs.' 56.1 Statement ¶¶ 41-43, 75, which significantly undercuts the notion that these searches were retaliation directed at Plaintiff. Defendants have also put forward

undisputed evidence for why all of the other searches were conducted on May 19, and all had

legitimate penological justifications. Defs. 56.1 Statement ¶¶ 64-75, 94-111. Finally, the

substantial temporal gap—nearly eleven months—between the filing of the Old Jail Grievance

on June 24, 2016 and the May 19, 2017 searches is fatal to Plaintiff's allegation of a causal

connection between that grievance and these searches. *See Thurmond v. Thomas-Walsh*, No. 18-

cv-409 (PMH), 2022 WL 18027617, at *5 (S.D.N.Y Dec. 30, 2022) (finding that a three month

delay between the alleged adverse action and the alleged retaliation was too great to satisfy the

casual connection prong).

Plaintiff also has failed to demonstrate that the June 8, 2017 strip search constitutes an

"adverse action," or that there was a causal connection between the filing of the May 22, 2017

grievance and the strip search on June 8, 2017. As discussed in Background Section I.A.2

above, the uncontroverted evidence submitted in connection with this motion is that WCJ

officials ordered the June 8, 2017 strip search in response to Sgt. Torres receiving information

from an informant, observations of inmate Jiminez taking items from Plaintiff's bag and putting

them down the front of his shirt, and a subsequent search of Jiminez that uncovered prohibited

items. Defs.' 56.1 Statement ¶¶ 94-102; Torres Aff. ¶¶ 3-4. As discussed above, the strip search

was reasonable in light of these facts and circumstances. *See Thurmond*, 2022 WL 18027617, at

*5 ("[I]f a defendant takes an action for both proper and improper reasons, state action may be

upheld if the action would have been taken based on the proper reasons alone." (quotation marks

omitted)). Sgt. Allen also affirmatively stated in his declaration that he did not order the strip

search as retaliation against Plaintiff. Allen Aff. ¶ 13. Plaintiff has not asserted any facts to the

contrary or come forward with any evidence to suggest that the strip search was ordered to deter

him from filing future grievances. Additionally, Plaintiff has put forth no evidence "to

demonstrate why a routine and ordinarily lawful strip search would deter a typical prisoner from exercising his or her First Amendment rights," *Pizarro v. Bd. of Corr.*, No. 16-cv-2418 (RJS), 2018 WL 3462512, at *6 (S.D.N.Y. July 17, 2018), and again, Plaintiff's subsequent filing of multiple additional grievances makes clear that he was not deterred from such filings.

As for the August 15 and October 6, 2017 searches, Plaintiff again has failed to provide evidence to show that either of these routine searches amounted to an adverse action or that either one was causally connected to any protected speech. As noted above, these searches were performed in accordance with WCJ policy, Archer Aff. ¶¶ 5, 34, and C.O. Archer expressly stated in her affidavit that neither was done for a retaliatory purpose, *id.* ¶ 33. Plaintiff does not point to any evidence to refute this contention, has not provided evidence to link these supposedly retaliatory searches to his protected speech, and has not demonstrated that any of these searches deterred him from further exercise of his First Amendment rights.

For these reasons, Plaintiff had failed to raise a triable issue of fact as to his First Amendment retaliation claim as to any of the allegedly retaliatory conduct, and Defendants' motion for summary judgment as to this claim is GRANTED.

## D.    Cell Search Claim

Plaintiff asserts that that the May 19, 2017 search of his cell violated his Eighth Amendment rights. May 19 Grievance at 3.

### 1.    Legal Standard

"It is well-settled that the prohibition against unreasonable searches and seizures does not apply to a prison cell." *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 509 (S.D.N.Y. 2012) (cleaned up). "The only constitutional limit on the search of a prison cell is imposed by the Eighth Amendment's bar against cruel and unusual punishment." *Jones v. Harris*, 665 F. Supp. 2d 384, 394-95 (S.D.N.Y. 2009). "[P]rison cell searches are actionable to the extent that they constitute

cruel and unusual punishment in violation of the Eighth Amendment, which is to say, if the cell search lacked any legitimate penological interest and is intended solely to harass." *Davis v. Collado*, No. 16-cv-7139 (KMK), 2018 WL 4757966, at *13 (S.D.N.Y. Sept. 30, 2018) (cleaned up). To prevail on an Eighth Amendment claim based on a cell search, a prisoner must demonstrate that a defendant "ordered the search[ ] with the specific intent to cause plaintiff harm and that the search[ ] in fact caused him harm." *Jones*, 665 F. Supp. 2d at 395 (quotation marks omitted). Again, to establish an Eighth Amendment violation, the conduct in question must be objectively serious and must have been committed by a prison official with "a sufficiently culpable state of mind amounting to at least deliberate indifference to his constitutional rights." *Id.* Courts have found that occasional cell searches do not rise to the level of a constitutional violation. *See Stewart v. Richardson*, No. 15-cv-9034 (VB), 2019 WL 719638, at *5-6 (S.D.N.Y. Feb. 20, 2019) (three cell searches in five weeks failed to establish a basis for an Eighth Amendment claim); *Jones*, 665 F. Supp. 2d at 395 (three searches in six weeks did not amount to a constitutional violation); *Little v. Municipal Corp.*, 51 F. Supp. 3d 473, 498-99 (S.D.N.Y. 2014) (three searches in one month was not a constitutional violation); *Mateo v. Bristow*, No. 12-cv-5052 (RJS), 2013 WL 3863865, at *8 (S.D.N.Y. July 13, 2013) (no Eighth Amendment violation based on single search, even where subjective prong satisfied).

### 2.    Analysis

The undisputed evidence before the Court is that Capt. Abrams ordered a search of the entire housing block located on the northeast wing of the second floor of the New Jail, which is where Plaintiff was housed at that time. Def.'s 56.1 Statement ¶ 75; Abrams Aff. ¶ 41. Plaintiff has not proffered any evidence to show that the search lacked a penological interest or that it was intended solely to harass him—in short, there is no evidence here that the search of Plaintiff's cell was anything "greater than a *de minimis* disruption," *Jones*, 685 F. Supp. 2d at 395, and

Plaintiff therefore cannot satisfy the requirement that the single search of his cell was objectively serious enough to qualify as a violation of the Eighth Amendment. Nor has Plaintiff offered any evidence that any Defendants who conducted the search did so with deliberate indifference to his rights. Because Plaintiff has failed to put forth evidence sufficient to satisfy either the objective or subjective elements, his Eighth Amendment claim based on the May 19, 2017 cell search fails as a matter of law, and Defendants' motion as to this claim is GRANTED.

### E.    Access to Courts Claim

Plaintiff maintains that his right to meaningful access to the courts was impeded by the August 8, August 15, and October 6, 2017 searches of his legal materials in the WCJ law library. *See* August 8 Grievance #1 at 2-4; August 8 Grievance #2 at 2-4; August 15 Grievance at 4, 6.

### 1.    Legal Standard

"Prisoners have a right to meaningful access to the courts." *Melendez v. Haase*, No. 04-cv-73 (PKC), 2010 WL 5248627, at *7 (S.D.N.Y. Dec. 15, 2010), *aff'd sub nom. Melendez v. Greiner*, 477 F. App'x 801 (2d Cir. 2012) (summary order). A claim for a denial of access to the courts may be grounded in multiple constitutional provisions. *See Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002); *Carzoglio II*, 2022 WL 2193376, at *9. "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986). "To establish a denial of access to courts claim, plaintiff must demonstrate not only that defendants deliberately or maliciously took or were responsible for actions that hindered plaintiff's efforts to pursue a legal claim, but that the defendants' actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim." *Stewart*, 2019 WL 719638, at *8 (cleaned up) (quoting *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)). "[I]nterferences that merely

delay an inmate's ability to work on a pending cause of action or to communicate with the courts do not give rise to a cause of action for a denial of access to the courts." *Gagot v. Rodriguez*, No. 08-cv-361 (LAP), 2011 WL 1201822, at *4 (S.D.N.Y. Mar. 23, 2011) (quotation marks omitted).

### 2.    Analysis

Plaintiff does not provide any evidence from which a reasonable jury could conclude that any Defendants acted deliberately and maliciously in searching his legal materials. C.O. Archer stated in her affidavit that these searches were conducted pursuant to the WCJ's search policy, *see* Archer Aff. ¶¶ 4-6, 34, and Plaintiff offers no evidence to refute this assertion. Nor has Plaintiff provided any evidence that he suffered the requisite injuries as a result of these searches. Instead, Plaintiff has alleged that he was only permitted to retain copies of certain legal papers (with the originals retained by WCJ personnel), that two writing pens were confiscated, and that a folder containing some of his legal materials was ripped. ECF No. 73 at 4-5. There is no suggestion anywhere in the record before the Court that any of Plaintiff's pending legal cases were dismissed or that he was hindered in pursuing any of his legal claims as a result of these searches. In fact, Plaintiff testified that when he complained to the state court that certain documents had been confiscated, the state court provided him with additional copies. Pl.'s Dep #2 at 26:9-17. None of the alleged injuries here is sufficient to allow Plaintiff's denial of access to court claim to proceed. *See, e.g., Gagot*, 2011 WL 1201822, at *4 (granting summary judgment to defendant where plaintiff was deprived of his legal materials for 24 hours, because "such a brief deprivation did not result in an actual impairment of a legal claim"); *Shepherd v. Fisher*, No. 08-cv-9297 (RA), 2017 WL 666213, at *39 (S.D.N.Y. Feb. 16, 2017) (granting summary judgment to defendants where "the alleged confiscation of [plaintiff's] legal mail did not prevent him from addressing the requirements of his then-pending case").

The record here is devoid of evidence to support either element of Plaintiff's claim for denial of access to the courts, and accordingly, Defendants' motion for summary judgment as to this claim is GRANTED.

### F.    Equal Protection Claim

Plaintiff contends that the August 15, 2017 law library search violated his rights under the Equal Protection Clause of the Fourteenth Amendment because he and another inmate of the same race were searched that day in the law library, but inmates of a different race were not. August 15 Grievance at 4, 6; Pl.'s Dep #2 at 31:3-32:3.

### 1.    Legal Standard

"The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner." *Allen v. Cuomo*, 100 F.3d 253, 260 (2d Cir. 1996). With respect to this claim, Plaintiff appears to be proceeding on a theory of selective enforcement or selective treatment. To establish an equal protection claim under this theory, a plaintiff must show that "(1) he [or she], compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, or to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the plaintiff." *Lopes v. Westchester Cnty.*, No. 18-cv-8205 (KMK), 2020 WL 7029002, at *8 (S.D.N.Y. Nov. 30, 2020); *see Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005). "To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he [or she] was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). "A plaintiff cannot merely rest on a demonstration of different treatment from persons similarly situated. Instead, he [or she] must prove that the disparate treatment was *caused by* the impermissible motivation." *Hu v. City of New York*, 927

31

F.3d 81, 91 (2d Cir. 2019) (emphasis in original) (cleaned up).  In the prison setting, a plaintiff

also must demonstrate that his or her "treatment was not reasonably related to any legitimate

penological interests."  *Phillips*, 408 F.3d at 129 (cleaned up).

> ## 2.    Analysis

There is no evidence in the record that would permit a reasonable jury to infer that C.O.

Archer acted with discriminatory intent when conducting searches at the WCJ law library on

August 15, 2017.  C.O. Archer explained in an affidavit that "[n]one of the searches [she]

performed were based on any inmate's race" and that "[a]ll of the searches were performed in

accordance with WCDOC rules and regulations."  Archer Aff. ¶¶ 32, 34; Defs.' 56.1 Statement ¶

128.  The evidence in the record indicates that the routine searches were related to legitimate

penological interests, and there is no evidence to support an inference that any purportedly

disparate treatment of Plaintiff was caused by an impermissible consideration.  Plaintiff points to

the fact that he and another Caucasian inmate had their legal materials searched, whereas two

African American inmates did not.  ECF No. 73 at 4; Pl.'s Dep. #2 at 31:4-32:3.  But the factual

record before the Court makes clear that Plaintiff and his proposed comparators were not

similarly situated.  Whereas Plaintiff was in possession of "voluminous documents" at the time

he was searched, Archer Aff. ¶ 15, the investigation into Plaintiff's grievance revealed that one

of the African American inmates who was not searched was not holding any materials to be

searched when he entered the library, and the other African American inmate who was not

searched held only a single sheet of white paper, which made a search unnecessary.  *See* August

15 Grievance at 8; Defs.' 56.1 Statement ¶ 126; Archer Aff. ¶¶ 22-23.  Plaintiff has not

attempted to refute these facts, or pointed to any other evidence to support a finding that C.O.

Archer intentionally or purposefully discriminated against him based on his race.

As a result, Defendants' motion for summary judgment as to Plaintiff's claim for violation of the Equal Protection Clause related to the August 15, 2017 law library searches is GRANTED.

## II.   "Old Jail" Claims

Defendants also seek dismissal of the claims related to Plaintiff's time in custody at the "Old Jail" facility.  *See* Defs.' Mem. at 2-9.  These include claims for the conditions of Plaintiff's confinement there, as well as claims for a procedural due process violation and an equal protection violation.

### A.   Conditions of Confinement Claim

Plaintiff asserts that the conditions of his confinement in the "Old Jail" portion of the WCJ violated his constitutional rights.  *See, e.g.*, Old Jail Grievance at 1-2.

#### 1.   Legal Standard

During the relevant period for Plaintiff's claims regarding the "Old Jail," Plaintiff was, at certain times, a pretrial detainee, and at other times a convicted prisoner.  His conditions of confinement claim must therefore be addressed under both the Eighth and Fourteenth Amendments—"the Eighth Amendment governs claims brought by convicted inmates, [and] the Fourteenth Amendment governs claims brought by pretrial detainees." *Tutora v. Aramark Corr. Servs.*, No. 17-cv-9170 (KMK), 2022 WL 2237567, at *8 (S.D.N.Y. June 22, 2022).  To establish an unconstitutional conditions of confinement claim under either the Eighth or Fourteenth Amendment, a plaintiff must demonstrate "(1) that [he or she] suffered a constitutional deprivation that was objectively, sufficiently serious, and (2) that the defendant acted with a sufficiently culpable state of mind." *Id.* (cleaned up).  "Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his

health, which includes the risk of serious damage to physical and mental soundness." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (cleaned up). "There is no static test to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* (cleaned up). It is clear that "prisoners may not be deprived of their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to their future health." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (cleaned up).

"The second element . . . is applied somewhat differently to claims under the Eighth Amendment than the Fourteenth Amendment." *Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 395 (S.D.N.Y. 2020) (cleaned up). Under the Eighth Amendment, the plaintiff must demonstrate that the defendant prison official acted with "deliberate indifference," which requires "more than mere negligence." *Jabbar*, 683 F.3d at 57 (cleaned up). "The prison official must know of, and disregard, an excessive risk to inmate health or safety." *Id.* "[T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

## 2.    Analysis

Plaintiff has failed to provide sufficient evidence to support his claims under either the Eighth or the Fourteenth Amendment standards. Plaintiff's allegations are based on the length of time he spent confined in his cell during certain periods of his incarceration; limitations on his

ability to exercise; his lack of access to a shower on certain days; his inability to make phone calls for as many as two days at a time; and having been required to eat meals in his cell.  Defs.' 56.1 Statement ¶ 17; Old Jail Grievance at 1-2.  Asst. Warden Vollmer does not dispute that inmates in the Old Jail are confined to their cells for approximately 17 hours per day, Vollmer Aff. ¶ 7, and Defendants have explained that these conditions are the result of certain physical plant limitations in the Old Jail portion of the facility, *see* Defs.' 56.1 Statement ¶¶ 13, 14, 18; Vollmer Aff. ¶¶ 4-5.  But courts in this District have found that prison policies that require detainees to be confined to their cells for 16 hours per day do not amount to an objectively serious deprivation, because such periods of confinement do not pose an unreasonable risk of serious damage to future health.  *See Washington v. Falco*, No. 20-cv-3009 (VB), 2021 WL 797658, at *6 (S.D.N.Y. Mar. 1, 2021).  Plaintiff's assertions regarding the length of his daily confinement at the WCJ, without more, are not sufficient to support a claim for unconstitutional conditions of confinement.

Plaintiff also alleges that he was allowed to use the dayroom for exercise only "sometimes."  Old Jail Grievance at 2.  Though prisoners must be afforded some opportunity for exercise, not every deprivation of the opportunity to exercise violates a prisoner's constitutional rights.  *See Santana v. City of New York*, No. 15-cv-6715 (ER), 2018 WL 1633563, at *7 (S.D.N.Y. Mar. 29, 2018).  To satisfy the objective element, "a plaintiff must show that he was denied all meaningful exercise for a substantial period of time."  *Williams v. Goord*, 142 F. Supp. 2d 416, 425 (2d Cir. 2001).  To determine if there was a violation, courts consider "(1) the duration of the deprivation; (2) the extent of the deprivation; (3) the availability of other out-of-cell activities; (4) the opportunity for in-cell exercise; and (5) the justification for the deprivation."  *Id.*  Here, Plaintiff testified that use of the dayroom alternated between the two

sides of the Old Jail housing block, with the north side using the dayroom at one time and the south side using it at another. Pl.'s Dep. #2 at 90:8-25, 94:10-95:11. But there is no evidence in the record that Plaintiff was prohibited from using the dayroom for exercise for an extended period of time; indeed, Plaintiff testified that he was allowed to use the shower when his unit had access to the dayroom, and that he went only as long as one day without access to the shower. *Id.*; Defs.' 56.1 Statement ¶ 26; Old Jail Grievance at 2. It therefore stands to reason, based on the evidence available, that Plaintiff never went longer than a day without access to the dayroom for exercise purposes as well, and Plaintiff has not put forth any evidence to suggest otherwise. Such brief limitations on a prisoner's ability to exercise are not sufficient to establish a constitutional violation as a matter of law. *See Santana*, 2018 WL 1633563, at *7.

Plaintiff's allegations regarding limitations on his access to showers are also insufficient to establish an objectively serious violation. The evidentiary record reflects that the longest Plaintiff went without a shower was one day. Pl.'s Dep. #2 at 90:8-25; 94:10-95:11; Defs.' 56.1 Statement ¶ 26; Old Jail Grievance at 2. Courts in the Second Circuit have found that deprivations of shower privileges for as long as two weeks do not rise to the level of a deprivation of basic human need. *See McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (dismissing an Eighth Amendment claim because "a two-week suspension of shower privileges [did] not suffice as a denial of basic hygienic needs" (cleaned up)); *Banks v. Argo*, No. 11-cv-4222 (LAP), 2012 WL 4471585, at *4 (S.D.N.Y. 2012) (denial of shower access for as long as 13 days is not a sufficient deprivation to establish a constitutional violation); *Perkins v. Perez*, No. 17-cv-1341 (KMK), 2019 WL 1244495, at *11 (S.D.N.Y. Mar. 18, 2019). Plaintiff's alleged restriction of shower privileges for a single day is plainly insufficient to establish a violation of his constitutional rights.

Plaintiff maintains that he was deprived of access to a telephone for up to two days at a time.  Defs.' 56.1 Statement ¶ 27; Pl.'s Dep. #2 at 94:24-95:11; Old Jail Grievance at 2.  But a detainee does not have a right to unlimited phone calls.  *See Al-Haj v. Singer,* No. 19-cv-3135 (LJL), 2021 WL 4442854, at *4 (S.D.N.Y. Sept. 28, 2021).  And a two-day limitation on telephone access is not sufficient to demonstrate a deprivation of constitutional rights.  *See Fullewellen v. City of New York*, No. 21-cv-7219 (MKV), 2023 WL 2390551, at *5 (S.D.N.Y. Mar. 7, 2023) (finding a "three-day deprivation of phone usage" insufficient to show a violation of rights).

Finally, Plaintiff complains that he was restricted to eating meals in his cell.  "There clearly is no constitutional right to eat all meals outside of a prisoner's cell."  *Graham v. Kuhlmann*, No. 88-cv-6618 (JSM), 1990 WL 210298, at *4 (S.D.N.Y. Dec. 12, 1990).  Plaintiff has not put forth sufficient facts to sustain a claim on this basis.

For all of these reasons, Defendants' motion for summary judgment as to Plaintiff's claims for violations of his Eighth and/or Fourteenth Amendment rights based on the conditions of his confinement at the WCJ is GRANTED.

### B.    Equal Protection Claim

Plaintiff also asserts that his rights under the Equal Protection Clause of the Fourteenth Amendment were violated because he and other inmates in the Old Jail were treated differently than inmates housed in the New Jail.  Old Jail Grievance at 1-2.

### 1.    Legal Standard

The legal standard for proceeding on a theory of selective enforcement or selective treatment is set forth in Discussion Section I.F.1 above.  Alternatively, Plaintiff may be attempting to pursue this equal protection claim based on a "class of one" theory, which requires that a plaintiff establish that "(i) no rational person could regard the circumstances of the plaintiff

to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Hu*, 927 F.3d at 94.

###    2.    Analysis

Plaintiff has not provided evidence sufficient to show that he suffered a constitutional violation because of his assignment to the Old Jail. While Plaintiff testified that inmates housed in the Old Jail are subject to stricter conditions of confinement that those in the New Jail, Pl.'s Dep. #2 at 90:8-93:22, he does not point to any facts to demonstrate that housing assignments were made based on any discriminatory basis, or even that initial housing decisions were made for particular reasons. Indeed, Plaintiff's understanding is that inmates were randomly assigned to the various housing facilities, *see* Defs.' 56.1 Statement ¶¶ 24-25, which would preclude a finding that any particular housing assignment was undertaken for an improper purpose or even made in contravention of established procedures. Defendants also have provided evidence to show that any differences between the Old Jail and New Jail were related to reasonable penological purposes. Asst. Warden Vollmer explained in his affidavit that the Old Jail "cannot be operated in the same manner as [the WCJ's] other sections" because it "is not designed to safely and securely accommodate an entire housing unit in the dayrooms or common areas." Vollmer Aff. ¶¶ 3-4. Plaintiff has not put forth any competent evidence to raise a genuine issue of material fact as to either a selective enforcement or a "class of one" theory for an equal protection claim based on his housing assignment. *Cf. Berkley v. City of New Rochelle*, No. 21-cv-578 (KMK), 2022 WL 784018, at *11 (S.D.N.Y. Mar. 15, 2022) (allegations that certain detainees were provided with face masks by the defendant police department after arrest, with no detail as to any similarities between the plaintiff and the other detainees beyond the fact that all

were detained by the same police agency, were found insufficient to state a "class of one" or selective enforcement equal protection claim).

Accordingly, Defendants' motion for summary judgment as to this equal protection claim also must be GRANTED.

### C.    Procedural Due Process Claim

Defendants move for summary judgment as to Plaintiff's claim that housing assignments at the WCJ violated his right to procedural due process.  Defs.' Mem. at 6-8.

#### 1.    Legal Standard

To demonstrate a violation of due process rights, a plaintiff must establish "'(1) that he [or she] possessed a liberty interest and (2) that the defendant(s) deprived him [or her] of that interest as a result of insufficient process.'"  *Gomez*, 2020 WL 635577, at *7 (quoting *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001)).  "The mere adoption of procedural guidelines governing day-to-day prison administration, without more, will not give rise to a state-generated liberty interest."  *Corley v. City of New York*, No. 14-cv-3202 (GHW), 2017 WL 4357662, at *9 (S.D.N.Y. Sept. 28, 2017).  A plaintiff "does not have a protected liberty interest in his [or her] [prison] housing assignment."  *Valencia v. Westchester Cnty.*, No. 19 cv 1699 (VB), 2020 WL 1233891, at *8 (S.D.N.Y. Mar. 13, 2020); *see also Cooper v. City of New York*, No. 13-cv-7590 (PKC), 2014 WL 5315074, at *4 (S.D.N.Y. Oct. 17, 2014).

#### 2.    Analysis

Plaintiff cannot sustain a procedural due process claim based on his housing assignment in the Old Jail.  The WCJ "enjoys broad leeway in deciding where to house the inmates under its protective care."  *Gomez*, 2020 WL 635577, at *7. "The law is clear that an inmate does not have a right to be confined to the prison of his [or her] own choosing or to a particular type of housing."  *Id.* (cleaned up).  Plaintiff did not have a liberty interest in which housing unit he was

assigned within the WCJ, and therefore he cannot establish a claim for a violation of due process rights. Moreover, Plaintiff's initial housing assignment was to the New Jail. *See* Defs.' 56.1 Statement ¶ 6; Housing History at 2. Only after he was found with a piece of wood hidden inside of his rectum and pled guilty to multiple charges at a subsequent disciplinary hearing was Plaintiff reclassified and assigned to the Old Jail. Defs.' 56.1 Statement ¶ 9; Disciplinary File at 9. Thus even if Plaintiff had a liberty interest in his housing assignment, that assignment was made after a hearing, and the record cannot support a claim that Plaintiff was deprived of that interest due to insufficient process.

Defendants motion for summary judgment as to the procedural due process claim is GRANTED.

## III.    Municipal Liability Claim

Defendant County of Westchester seeks the dismissal of any cause of action in the complaint that can be construed as alleging that the County had an on official policy or custom that caused a violation of Plaintiff's constitutional rights. *See* Defs.' Mem. at 20-21.

### A.    Legal Standard

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *accord Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 636 (S.D.N.Y. 2015).

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'"  *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003) (summary order).  A plaintiff may satisfy the "policy or custom" requirement by proving one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Buari v. City of New York*, 530 F. Supp. 3d 356, 397-98 (S.D.N.Y. 2021) (collecting cases).  In addition, to prevail on a *Monell* claim, a plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("Governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

## B.    Analysis

Because Plaintiff has failed to come forward with sufficient evidence to allow a reasonable jury to conclude that he suffered a deprivation of any constitutional right, any *Monell* claim for municipal liability claim must be dismissed as well.  *Ramlogan v. White*, No. 20-cv-5879 (JPC), 2024 WL 1313417, at *9 (S.D.N.Y. Mar. 27, 2024).

Accordingly, Defendants' motion for summary judgment as to the *Monell* claim is GRANTED.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No 85) is GRANTED in its entirety.

The Clerk of Court is respectfully directed to enter judgment in favor of Defendants and close this case.

Dated: September 30, 2024
       White Plains, New York

**SO ORDERED.**

_____
ANDREW E. KRAUSE
United States Magistrate Judge

A copy of this Decision and Order has been mailed by Chambers to the *pro se* Plaintiff at his address of record on the docket as of the date of the Decision and Order.